UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

NICHOLAS ALLEN,

                        Petitioner,

                                                    **MEMORANDUM & ORDER**
                                                    19-CV-3672 (RPK)

            - against -

    MARK ROYCE, *Superintendent, Green Haven*
    *Correctional Facility*,

                        Respondent.

---------------------------------------------------------------

RACHEL P. KOVNER, United States District Judge:

        Petitioner Nicholas Allen is serving a state prison sentence for second-degree manslaughter, second-degree criminal possession of a weapon, and first-degree reckless endangerment.  The charges stem from the shooting death of Avalisa Morris at a house party in Queens, New York.  Allen now seeks a writ of habeas corpus under 28 U.S.C. § 2254.  He raises two claims: that the evidence presented at his trial was insufficient and that the prosecution made improper comments during summation.  Petitioner has failed to show that the state appellate decision rejecting these claims was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  Accordingly, the petition is denied.

# BACKGROUND

## I.    The Shooting

The following facts are taken from the state court record, viewed in the light most favorable to the prosecution.  *See Cavazos v. Smith*, 565 U.S. 1, 7 (2011) (per curiam); *McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (per curiam).

Petitioner was a friend of co-defendant Oneil Mairs.  (T. 1176-78, 1191-92, 1194-95.)[*] On February 4, 2011, Mairs brought petitioner to a lounge in Queens, New York.  There, petitioner met and spent three or four hours with Brittany Goodridge.  (T. 736-37, 969.)  Petitioner asked Goodridge for her phone number; Goodridge declined but told petitioner that she might provide her number to petitioner if he attended a surprise birthday party for her friend Nicole Skervin the following night.  (T. 737, 755.)

Petitioner and Mairs both attended the surprise birthday party for Skervin on February 5, 2011.  (T. 759.)  The party was held at the home of Allyn "Vanessa" Teel.  (T. 464, 628-29.)  Teel lived on the first floor of a two-family home and hosted the party in the basement.  (T. 464, 628-29.)  The second-floor tenant, Richard "Wayne" Bennett, also attended the party.  (T. 463-65.)

Petitioner and Mairs spoke with Goodridge briefly at the party, and petitioner exchanged phone numbers with Goodridge.  (T. 738-39.)  About an hour later, petitioner told Goodridge that he was leaving to visit another party but planned to come back.  (T. 739-40.)  Petitioner followed through, returning roughly an hour later and letting Goodridge know he was back.  (T. 790.)

---

[*] Citations to "T." refer to the transcript of Petitioner's retrial commencing October 23, 2014 and ending November 13, 2014.  (Dkt. #6-1 to -7.)  Citations to the record follow each document's internal pagination, not the pagination assigned by the Electronic Court Filing system.

Teel's sister Mary "Bo" Johnson was also at the party.  (T. 628.)  Around 2 a.m., Johnson was outside Teel's house when she noticed a man hugging a crying woman who she later learned was Mairs's girlfriend, Felicia Douglas.  (T. 629-31, 1041.)  Johnson spoke with the man and Douglas.  (T. 631.)  She then saw petitioner and Mairs walking together from the front of the house toward the back, with Johnson's friend Donovan behind them.  (T. 631-33.)  Johnson approached petitioner and Mairs and told Mairs the party was over, but Mairs wanted to return to the basement.  (T. 633.) Johnson and Mairs spoke for about fifteen or twenty minutes, while petitioner stood with Mairs.  *Ibid.*  At some point, Donovan grabbed Johnson's arm and said, "Mary, enough."  (T. 634.)  Then petitioner and Mairs reentered the basement.  (T. 634.)

Around 4 or 4:15 a.m., outside Teel's house, Mairs punched Douglas in the face.  (T. 917-18.)  Douglas began crying.  (T. 919.)  Skervin, who witnessed the punch, brought Douglas into the first-floor living room.  (T. 919-20.)  Afterward, Skervin and several others confronted Mairs, who was in the basement, and told him that he had to leave the party.  (T. 921.)  During the confrontation, someone tried to grab Mairs's wrist, but Mairs drew his hand back.  *Ibid.*  When Mairs did so, his shirt rode up, at which point Skervin spotted the butt of a gun in Mairs's waistband.  *Ibid.*

At this point, petitioner and another man came over to help Mairs in the scuffle.  (T. 922.)  Skervin and others began pushing petitioner, Mairs, and the third man out of the basement through the exit door.  (T. 470-72, 555-56, 924.)  Mairs yelled that he would not leave.  (T. 924.)  But eventually, the group succeeded in pushing the three men out.  (T. 556, 924-25.)

While this conflict was underway, another partygoer, Vanessa Edwards, was speaking with Douglas near the top of the staircase leading to the basement door.  (T. 836.)  Edwards heard footsteps and saw Mairs and several other people climbing up the stairs.  Mairs had a black gun in

his hand.  (T. 837-38.)  Edwards crouched down and told Douglas to get down because Mairs had a gun.  (T. 838.)  While crouched, Edwards saw Mairs and the others go back down the stairs. *Ibid.*

At that point, the conflict escalated.  According to several witnesses, Mairs and petitioner began pushing on or kicking the door to reenter the basement.  (T. 556-57, 637, 925-28.)  Skervin, Morris, and others pushed or braced against the door from the opposite side to keep the men out of the basement, causing the door to move back and forth.  *Ibid.*  After forcing the door closed again, Morris braced her whole body against the door, facing away from it, when two gunshots rang out from the other side of the door.  (T. 474, 557, 928.)

Following the second gunshot, Morris fell to the ground.  (T. 557, 638-39, 928.)  Another partygoer, Kahan Williams, testified that he was in the basement when he heard the gunshots and saw Morris fall to the ground, and that he reacted by running toward the still-moving door to brace it shut and by yelling, "Someone got hit," and "she's down."  (T. 557-58.)  After Williams yelled, the shooting stopped and the men outside the basement door stopped pushing.  (T. 558.)

Edwards testified that she was still upstairs and crouching along with Douglas when she heard a gunshot.  (T. 839.)  She testified that she grabbed Douglas and ran to hide behind the garage.  *Ibid.*  While hiding, she heard a second gunshot.  *Ibid.*  According to Edwards, after hearing the gunshots, she "peeped out" from behind the garage and saw Mairs and his male friends leaving.  (T. 840.)

Following the second shot, Bennett, the second-floor tenant, testified that he ran to the front door of his apartment.  The door was on the outside of the building, at the front of the house.  (T. 475.)  While trying to enter his apartment, Bennett saw petitioner and two other men come from the back of the house towards the front of the house.  (T. 474-75.)  Bennett testified that as he tried

4

to find his keys, he made eye contact with petitioner, who pointed a black gun at Bennett, rotated slightly to the left, and asked, "What are you looking at?"  (T. 475-80.)  Bennett also saw one of the other men tuck something in his waistband as they left.  (T. 482.)

Johnson corroborated Bennett's account.  Johnson testified that she was inside Teel's first-floor apartment checking on Teel's children and had gone to lock Teel's front door when she heard Bennett fumbling with his keys outside.  (T. 639.)  Thinking it was her nephew trying to enter Teel's apartment, Johnson opened the front door to see Bennett attempting to enter his apartment via the adjacent door.  (T. 639.)  With Teel's door open, Johnson saw petitioner and Mairs walking past the front of the house, and watched as petitioner pointed a gun at Bennett and said, "Whatcha lookin' at, pussy?"  (T. 639-40.)

Several people called 911.  (T. 369.)  Emergency medical technician Hasnie Ahmethaj found Morris on the ground in the basement at Teel's home, not breathing, with a gunshot wound to the left side of the head and exposed brain matter.  (T. 365.)  EMT Ahmethaj pronounced Morris dead at 4:37 a.m. due to a "mortal wound injury secondary to a gunshot wound."  (T. 366.)

Detective Marvin Miller, a crime scene investigator, also responded to the crime scene.  (T. 388.)  Detective Miller found two .45 caliber spent shell casings fired from a semi-automatic weapon at the bottom of the stairs leading to the basement, on the left side.  (T. 389, 399.)  Firing such a weapon, Detective Miller testified, would raise its temperature due to the burnt gunpowder emitted from the gun's barrel.  (T. 392.)  Detective Miller testified that when a .45 caliber semi-automatic weapon is properly fired, the weapon ejects spent shell casings to the right, but that if the shooter rotates the gun to the left, the casings will instead eject leftward.  (T. 391, 446-49.)

Detective Miller also observed two bullet holes in the door leading to the basement.  (T. 392.)  The first bullet hole was sixty-one inches from the bottom of the door and tended toward

5

the door's center, while the second bullet hole was fifty-and-a-half inches from the bottom of the door and near the doorknob.  (T. 397-98.)  Detective Miller testified that, given the shapes of the bullet holes, they were likely caused by a shooter firing from different positions: the first shot likely came from the left in a "small area probably going towards the stairway or up the stairway," while the second was more direct, likely caused by a shooter standing directly in front of the door. (T. 414-16.)

An autopsy confirmed that Morris had suffered a gunshot wound to the head.  (T. 1112.) According to the deputy chief medical examiner present at the autopsy, that wound caused Morris's death.  (T. 1109, 1111, 1118.)

Mairs turned himself in at the police station at 10:45 a.m. on the morning of the shooting. (T. 1047-48.)  Petitioner was apprehended a month later as a result of a traffic stop while driving a vehicle registered to Mairs.  (T. 721-22, 1062-63.)

## II.   Procedural History

Petitioner and Mairs were each charged with second-degree murder, second-degree criminal possession of a weapon, and first-degree reckless endangerment.  (T. 279-81.)  They were tried together.  (T. 279.)  The jury at an initial trial failed to reach a verdict on any counts against either defendant, and the trial court declared a mistrial.  (Tr. of First Jury Trial on May 19, 2014, at 11, Dkt. #6-1 at 156.)

At a retrial, the jury found both petitioner and Mairs not guilty of second-degree murder. (T. 1410.)  But the jury found both petitioner and Mairs guilty of the lesser-included offense of second-degree manslaughter.  *Ibid.*  The jury also found both defendants guilty of second-degree criminal possession of a weapon and of first-degree reckless endangerment.  *Ibid.*

The state trial court sentenced both petitioner and Mairs to concurrent sentences of five to fifteen years of imprisonment for manslaughter, fifteen years of imprisonment and five years of post-release supervision for criminal possession of a weapon, and twenty-eight months to seven years of imprisonment for reckless endangerment.  (Tr. of Resentencing held January 7, 2015, at 3-4, Dkt. #6-7 at 110-11.)

On appeal, the New York Supreme Court, Appellate Division, affirmed petitioner's conviction and his sentence.  *People v. Allen*, 69 N.Y.S.3d 104, 105 (N.Y. App. 2018) (Feinman, J.).  The court rejected petitioner's claim that there was insufficient evidence to support his convictions, determining that "the evidence was legally sufficient to establish beyond a reasonable doubt" petitioner's guilt on all the charges "based on an acting-in-concert theory."  *Ibid.*  The Appellate Division also stated that it was "satisfied that the verdict of guilt was not against the weight of the evidence."  *Ibid.*  In addition, the court rejected petitioner's argument that the prosecutor's summation comments were improper and denied him a fair trial.  *Ibid.*  To the contrary, the court concluded, "[t]he prosecutor's comments on summation were either fair comment on the evidence and the reasonable inferences to be drawn therefrom or responsive to defense counsel's summation, or otherwise did not deprive [petitioner] of a fair trial."  *Ibid.*

The New York Court of Appeals denied leave to appeal.  *People v. Allen*, 31 N.Y.3d 980 (N.Y. 2018).

Separately, the Appellate Division affirmed Mairs's conviction.  *People v. Mairs*, 66 N.Y.S.3d 635, 635 (N.Y. App. 2018), and the New York Court of Appeals denied leave to appeal, *People v. Mairs*, 31 N.Y.3d 1119 (N.Y. 2018).

In 2019, petitioner filed this petition for a writ of habeas corpus.  Petitioner argues, first, that the Appellate Division unreasonably determined that sufficient evidence existed to prove his

guilt beyond a reasonable doubt.  Second, petitioner contends the Appellate Division unreasonably rejected his claim that the prosecution's comments during summation deprived him of due process.

## DISCUSSION

Petitioner has not demonstrated that the Appellate Division decision affirming his convictions was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  Accordingly, the petition is denied.

## I.      Standard of Review

A person in custody pursuant to a state judgment may seek habeas corpus on the ground that he is being held "in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The scope of federal review of a claim depends on whether the claim was "adjudicated on the merits in State court proceedings."  28 U.S.C. § 2254(d); *see Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009).  If the claim was adjudicated on the merits by a state court, the district court may grant the habeas application only if the state adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).

A state court's decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" the Supreme Court's result.  *Bell v. Cone*, 543 U.S. 447, 452-

53 (2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).   A state court's decision "involved an unreasonable application of" Supreme Court precedent if there is "no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

A determination that a state decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2), requires more than that a federal court conducting habeas review "would have reached a different conclusion in the first instance. *Brumfield v. Cain*, 576 U.S. 305, 313-14 (2015) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)) (internal quotation marks omitted).   "[I]f reasonable minds reviewing the record might disagree about the finding in question, on habeas relief, that does not suffice to supersede the trial court's determination." *Id.* at 314 (brackets, ellipses, and internal quotation marks omitted).   But state court findings "might represent an 'unreasonable determination of the facts' where, for example, reasonable minds could not disagree that the trial court misapprehended or misstated material aspects of the record in making its finding, or where the court ignored highly probative and material evidence." *Cardoza v. Rock*, 731 F.3d 169, 178 (2d Cir. 2013) (internal citation and quotation marks omitted).

These standards are "intentionally difficult to meet," *Woods v. Donald*, 575 U.S. 312, 316 (2015) (citing *White v. Woodall*, 572 U.S. 415, 418 (2014)), because federal habeas review is "a 'guard against extreme malfunctions in the state criminal justice systems,'" rather than "a means of error correction," *Greene v. Fisher*, 565 U.S. 34, 43 (2011) (quoting *Harrington*, 562 U.S. at 102-03).

## II.    Sufficiency-of-the-Evidence Challenge

Petitioner is not entitled to relief on his insufficient evidence claim.

A.      **Due Process Requirements**

"The Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Jackson v. Virginia*, 443 U.S. 308, 315 (1979) (internal citation and quotation marks omitted).  In reviewing the sufficiency of the evidence to support a conviction, however, a court does not "ask itself whether *it* believes the evidence at the trial established guilt beyond a reasonable doubt." *Id.* at 318-19 (internal citation and quotation marks omitted).  Instead, the reviewing court must uphold the conviction "so long as 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* at 319 (internal citation omitted).  Put differently, "[a] reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam).

Under that standard, "[a] reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (quoting *Jackson*, 443 U.S. at 326).  Likewise, "the assessment of the credibility of witnesses is generally beyond the scope of review." *Schlup v. Delo*, 513 U.S. 298, 330 (1995).  This "limited review" ensures courts "do[] not intrude on the jury's role 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Musacchio v. United States*, 577 U.S. 237, 243 (2016) (quoting *Jackson*, 443 U.S. at 319).

A "twice-deferential standard" of review applies to sufficiency-of-the-evidence challenges on federal habeas review. *Parker v. Matthews*, 567 U.S. 37, 43 (2012) (per curiam). The standard is doubly deferential because "the deference to state court decisions required by [28 U.S.C.] § 2254(d) is applied to the state court's already deferential review." *Cavazos*, 565 U.S. at 7. Accordingly, "a state-court decision rejecting a sufficiency challenge may not be overturned on federal habeas unless the 'decision was objectively unreasonable.'" *Matthews*, 567 U.S. at 43 (quoting *Cavazos*, 565 U.S. at 2).

### B.    Relevant New York Law

When reviewing a conviction for sufficiency of the evidence, "federal courts must look to state law for 'the substantive elements of the criminal offense.'" *Johnson*, 566 U.S. at 655 (quoting *Jackson*, 443 U.S. at 324 n.16). Petitioner was convicted of second-degree manslaughter, second-degree criminal possession of a weapon, and first-degree reckless endangerment. Under New York law, a person commits second-degree manslaughter when he "recklessly causes the death of another person." N.Y. Penal L. § 125.15(1). A person commits second-degree criminal possession of a weapon when he "possesses a loaded firearm" coupled "with [the] intent to use the same unlawfully against another." *Id.* § 265.03(1)(b). And a person commits first-degree reckless endangerment when he "recklessly engages in conduct which creates a grave risk of death to another person" and does so "under circumstances evincing a depraved indifference to human life." *Id.* § 120.25.

Petitioner and Mairs were charged with committing these crimes while "acting in concert." (T. 279-81.) Under this doctrine of accessory liability, "[w]hen one person engages in conduct which constitutes an offense, another person is criminally liable for such conduct when, acting with the mental culpability required for the commission thereof, he solicits, requests, commands,

importunes, or intentionally aids such person to engage in such conduct." N.Y. Penal L. § 20.00. To satisfy the requirement that an accomplice "act with the mental culpability required for the commission" of the offense, "an accomplice must have a shared intent, or 'community of purpose' with the principal." *People v. Guerrero*, 55 N.Y.S.3d 67, 69 (N.Y. App. 2017) (quoting *People v. Carpenter*, 30 N.Y.S.3d 299, 301 (N.Y. App. 2016)). Shared intent or community of purpose can be inferred "from an act itself or from the conduct of an accessory and the surrounding circumstances." *People v. Meija*, 747 N.Y.S.2d 788, 788 (N.Y. App. 2002).

"In addition to the mens rea requirement, the statute includes an actus reus component as well: 'the accomplice must have intentionally aided the principal in bringing forth a result.'" *Carpenter*, 30 N.Y.S.3d at 301 (quoting *People v. Kaplan*, 556 N.E.2d 415, 418 (N.Y. 1990)).

### C.     Application

The Appellate Division concluded that the evidence was sufficient to establish petitioner's guilt on all three charges, beyond a reasonable doubt, "based on an acting-in-concert theory." *Allen*, 69 N.Y.S.3d at 105. That determination did not reflect either an unreasonable determination of the facts or an unreasonable application of any clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d). To the contrary, it was rational for jurors to conclude based on the evidence at trial that petitioner had "a shared intent, or 'community of purpose'" with Mairs in committing the charged crimes, *Guerrero*, 55 N.Y.S.3d at 69, and that petitioner intentionally aided Mairs in achieving the ultimate goal of the charged offenses, *Carpenter*, 30 N.Y.S.3d at 301. Specifically, prosecutors offered testimony from which jurors could conclude that after Mairs and petitioner were ejected from the party, Mairs removed a gun from his waistband. (T. 921, 837-38.) Prosecutors also offered testimony from which jurors could conclude that Mairs held the gun

in a manner that would have been visible to petitioner when he was standing near Mairs.  (T. 837-38.)

Jurors could reasonably infer the requisite actus reus and mens rea from those facts.  In particular, jurors could reasonably infer that petitioner intentionally aided Mairs in actions that violated the weapon-possession, manslaughter, and reckless endangerment statutes when he chose to help Mairs attempt to forcibly reenter the basement despite knowing that Mairs was wielding a gun.  Similarly, jurors could infer from petitioner's choice to help Mairs in forcibly reentering the basement when Mairs had a gun in his hand that petitioner shared Mairs's intent that the gun be used unlawfully against the people who had just ejected Mairs and petitioner from the party.  Jurors could infer that petitioner shared the mens rea of recklessness required to sustain his manslaughter and reckless-endangerment convictions based on those same facts.  In finding the requisite mens rea, jurors could also rely on petitioner's decision, after the shooting, to leave the scene with Mairs and to threaten Bennett with a handgun.  Those actions reinforce that the shooting was not a turn of events that took petitioner by surprise but was rather a reflection of Mairs's and petitioner's shared intent.  Applying the double-layered deference appropriate for habeas review of a state court's sufficiency-of-the-evidence determination, there is no basis for reversal here.

### III.   Prosecutor's Summation

Petitioner is not entitled to relief on his claim that prosecutors committed misconduct in closing arguments.

"[W]hile the State has a 'duty to refrain from improper methods calculated to produce a wrongful conviction,' such methods will warrant habeas relief only if they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Jackson v. Conway*, 763 F.3d 115, 146 (2d Cir. 2014) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935); then

quoting *Darden v. Wainwright*, 477 U.S. 168, 180 (1986)).  The Court "must consider the record as a whole when making this determination, because even a prosecutor's inappropriate or erroneous comments or conduct may not be sufficient to undermine the fairness of the proceedings when viewed in context." *Ibid.* (internal citations omitted).  Under that framework, the Appellate Division did not unreasonably construe or apply Supreme Court precedent in concluding that "[t]he prosecutor's comments on summation were either fair comment on the evidence and the reasonable inferences to be drawn therefrom or responsive to defense counsel's summation, or otherwise did not deprive [petitioner] of a fair trial." *Allen*, 69 N.Y.S.3d at 105.

In many of the comments to which petitioner objects in seeking habeas relief, the prosecutor simply argued permissible inferences from the evidence on disputed issues at trial.  For instance, the argument that the defendants "shot through that door not once but twice not caring who died, who they killed" (T. 1337), and that defendants knew they were endangering the lives of dozens of people in the basement that night, (T. 1336-37), *see* Pet. Br. 56, amounted to fair comment on the reasonable inferences to be drawn from the evidence and were relevant to the charge of reckless endangerment.  The prosecutor's argument that the petitioner, rather than Mairs, fired the fatal shot—based on various reasons derived from the trial evidence—likewise asked the jurors to draw permissible inferences from the evidence they had heard.  (T. 1353-1357.)  Such "statements during summations that are 'permissible inferences from the evidence at trial' do not constitute prosecutorial misconduct." *Portes v. Capra*, 420 F. Supp. 3d 49, 57 (E.D.N.Y. 2018) (quoting *United States v. Rivera*, 971 F.2d 876, 884 (2d Cir. 1992)).

Petitioner fares no better in arguing that other comments constituted misconduct because they improperly appealed to jurors' emotions.  For instance, petitioner faults the prosecutor's statement that "[i]t is a miracle that only one life was lost," (T. 1336), the prosecutor's description

14

of Morris as "a modern-day hero" who "took a bullet for her best friend," (T. 1364-65), and the prosecutor's argument that petitioner and Mairs were "embarrassed" and "humiliated" and that their "rage [was] boiling over" because they had been "pushed out of the party by these three women," (T. 1338, 1366.)   And petitioner faults a prosecutor's use during summation of two photographs of Morris—one that the prosecutor described as showing Morris "alive and well before the shooting," and another that the prosecutor described as showing "her after [the shooting] in the morgue."   (T. 1336.)   "Although a 'prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury,' . . . the stakes are high, and the participants are inevitably charged with emotion.'"   *Sullivan v. Lee*, No. 10-CV-425 (CBA), 2017 WL 3634598 at *9 (E.D.N.Y. Aug. 22, 2017) (quoting *United States v. Young*, 470 U.S. 1, 9 n.7, 10 n.8 (1985)). While some of the statements noted above were charged with emotion, they do not qualify as the type of especially "inflammatory or egregious" comments that can justify setting aside a state verdict during federal habeas review.   *Bradley v. Meachum*, 918 F.2d 338, 343 (2d Cir. 1990).

Petitioner has likewise failed to demonstrate any due process violation through his claim that prosecutors engaged in improper vouching.   Petitioner alleges that a prosecutor vouched for Skervin by stating that "when you listen to [Skervin] testify, this was very difficult for her for many reasons," and that jurors could "imagine how [Skervin] must have felt" while testifying.   (T. 1364-65.)   But those comments were a permissible response to defense counsel's summation, which sought to undercut Skervin's trial testimony by noting that Skervin had not told police about Mairs's gun immediately after the shooting and further suggested that Skervin might be fabricating her trial testimony "to get somebody."   (T. 1283-86.)   Even comments that would ordinarily be inappropriate in summation may not violate due process where, as here, they are "responsive to the opening summation of the defense."   *Deokoro v. Graham*, No. 16-CV-5487 (CBA) (LB)**,** 2017

WL 10820215, at *4 (E.D.N.Y. Nov. 15, 2017) (quoting *Darden v. Wainwright*, 477 U.S. 168, 182 (1986)).  Here, the prosecutor's comments permissibly responded to defense counsel's argument that discrepancies in Skervin's account cast doubt on her credibility.

Nor did prosecutors improperly vouch for the government's witnesses in arguments regarding those witnesses' incentives at trial.  Petitioner faults a prosecutor for stating that because Skervin was unable to prevent Morris's death, "[t]he only thing that [witnesses] could do is to come into court and tell what they know so that the people responsible for her murder will be held accountable for that."  (T. 1344.)  Petitioner likewise faults a prosecutor for stating that if the witnesses—friends of Morris—truly wanted justice for Morris's killers, it would not make sense for them to frame an innocent person.  (T. 1350.)  And he suggests a prosecutor engaged in improper vouching by stating that if the prosecution's witnesses had indeed been willing to "lie under oath" in order to obtain convictions, they would have come up with a lie that would more clearly implicate petitioner (T. 1350).  While the prosecution "may not vouch for its witnesses' credibility," *United States v. Newton*, 369 F.3d 659, 681 (2d Cir. 2004), the remarks here did not suggest that prosecutors "had additional evidence, not introduced at trial but known to the prosecutor, that supports the witness's credibility," *ibid.*  Nor did they make credibility remarks "explicitly couched in terms of [the prosecutor's] personal opinion." *Jackson v. Conway*, 763 F.3d 115, 150 (2d Cir. 2014).  Instead, the remarks amount to arguments from the evidence and from common sense regarding witnesses' incentives to tell the truth.  These remarks were not improper vouching.

A prosecutor's description of the acting-in-concert doctrine that drew on a relative's military service also did not amount to misconduct.  Petitioner focuses on a prosecutor's mention of her father's service in the Korean War, followed by a statement that "[b]ecause he never fired

his guns does not mean he was not there in the Korean War, right?" (T. 1347.)   In the challenged remarks, the prosecutor then suggested that petitioner and Mairs acted in concert, even though only one of the defendants fired a gun, in the same way that a soldier acts in concert with his comrades even though that soldier may never fire his or her gun. (T. 1347.)  Petitioner does not explain why he regards that analogy as objectionable. *See* Pet. Br. 22-23.  And in context, these comments do not appear to have had any improper purpose or effect.  During *voir dire*, prosecutors had twice attempted to illustrate the acting-in-concert principle by offering an analogy to military service: that soldiers who do not fire their weapons are nonetheless acting in concert with other soldiers who do.  (T. 83-84, 148.)  The challenged statements in summation reference the military analogy for the same purpose: to illustrate that petitioner could have been acting in concert with Mairs, even if petitioner did not fire the fatal shot.

Finally, petitioner has not established a due process violation through his allegation that prosecutors committed misconduct in a statement allegedly implying that defense counsel was "smug."  Defense counsel had asserted in his defense summation that law enforcement witnesses had been "smug," and criticized them, saying, "This is serious stuff.  Don't come in here and be smug." (T. 1317-18.)  A prosecutor responded in rebuttal:

| | |
|---|---|
| PROSECUTOR: | And [defense counsel] actually stood here and says that Detective Pearson insulted me by his answer.  He was so smug.  Well, I think that's, that's pretty telling as to who that's coming from. |
| DEFENSE COUNSEL: | Objection, Judge. |
| THE COURT: | I apologize.  Didn't hear it. |
| PROSECUTOR: | I'll withdraw. |
| DEFENSE COUNSEL: | Whether I call him smug, you can tell who that's coming from. |

| | |
|---|---|
| PROSECUTOR: | He called him smug.  That's for you to decide who's smug in this case, ladies and gentlemen. |
| DEFENSE COUNSEL: | Objection. |
| THE COURT: | Sustained. |

(T. 1350-51.)

Prosecutors' statements involving the word "smug" do not rise to the level of a due process violation.  As a general rule, "attacks on the credibility or motives of defense counsel are not permissible."  *Mickens v. United States*, 53 F. Supp. 2d 326, 332 (E.D.N.Y. 1999) (citing *United States v. Friedman*, 909 F.2d 705 (2d Cir. 1990); *Bruno v. Rushen*, 721 F.2d 1193 (9th Cir. 1983), *cert. denied*, 469 U.S. 920 (1984)).  But "a prosecutor does have the right to comment on defense counsel's argument during summation."  *Ibid.* (citing *United States v. Caputo*, 808 F.2d 963, 968 (2d Cir. 1987); *United States v. Praetorius*, 622 F.2d 1054, 1060-61 (2d Cir. 1979)).  Here, the prosecutor's statement was a direct response to defense counsel's attack on the demeanor of police witnesses.  And while the prosecutor's response could be interpreted as a personal attack on defense counsel, at least the comment that the prosecutor did not withdraw is also susceptible to a more benign interpretation: that jurors should reject defense counsel's argument about the demeanor of the law enforcement witnesses.  Moreover, the trial court sustained petitioner's objection to the prosecutor's comments, limiting the impact of those comments on the jury.  *See Moore v. Conway*, 476 F. App'x 928, 931 (2d Cir. 2012).  Taking into account the surrounding circumstances, the statement did not deprive petitioner of due process.

At minimum, whether the challenged statements are considered separately or taken together, the Appellate Division did not unreasonably construe or apply Supreme Court precedent in concluding that prosecutors did not engage in any misconduct that deprived the defendant of a

fair trial. *See Allen*, 69 N.Y.S.3d at 105. Accordingly, petitioner is not entitled to habeas relief based on prosecutorial misconduct.

## IV.     Certificate of Appealability

A certificate of appealability is available "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make that showing, an applicant must demonstrate "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). Because petitioner has not made the requisite showing as to his sufficiency challenge or his prosecutorial misconduct claim, a certificate of appealability is denied.

**CONCLUSION**

Petitioner's application for a writ of habeas corpus is denied. A certificate of appealability is also denied.

SO ORDERED.

/s/ Rachel Kovner
RACHEL P. KOVNER
United States District Judge

Dated: January 13, 2022
          Brooklyn, New York